# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANCES PEREZ, | Case No. 1:24-cv-01322-SAB |
| Plaintiff, | ORDER AFFIRMING DECISION OF THE COMMISSIONER OF SOCIAL SECURITY |
| v. | (ECF Nos. 11, 15) |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

Plaintiff Frances Perez ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability benefits pursuant to the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted without oral argument.

Plaintiff requests the decision of Commissioner be vacated and the case be remanded for further proceedings, arguing that the decision below was not supported by substantial evidence. Specifically, Plaintiff argues that the Administrative Law Judge ("ALJ") erred by not resolving a conflict with the Dictionary of Occupational Titles ("DOT"), failing to state clear and convincing reasons for rejecting certain portions of Plaintiff's testimony, and failing to develop the record.

For the reasons explained herein, the Court will affirm the decision of the Commissioner.

/ / /

/ / /

1

# I.

## BACKGROUND

### A.    Procedural History

On April 22, 2022, Plaintiff protectively filed a Title II application for a period of disability and disability insurance benefits; on that same date, Plaintiff simultaneously filed a Title XVI application for supplemental security income.  (ECF No. 10, Administrative Record ("AR"), 24.)  In both applications, Plaintiff alleged a disability onset date of January 1, 2020.  (Id.)  Plaintiff's applications were initially denied on October 5, 2022, and denied upon reconsideration on January 24, 2023.  (Id.)  Plaintiff requested before a hearing before an ALJ.  On January 23, 2024, Plaintiff, represented by counsel, appeared for a hearing in front of an ALJ.  (Id.)  Plaintiff and vocation expert ("VE") Victoria Rei testified.  (Id.)  On May 15, 2024, the ALJ issued a decision concluding that Plaintiff was not disabled.  (AR 41.)  On August 30, 2024, the Appeals Council denied Plaintiff's request for review.  (AR 1-5.)

### B.    The ALJ's Findings of Fact and Conclusions of Law

In the decision, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2025, and that Plaintiff had had not engaged in substantial gainful activity since January 1, 2020, the alleged onset date.  (AR 27.)  The ALJ found that Plaintiff had the following severe impairments: major depressive disorder, anxiety, functional neurological symptoms disorder, degenerative joint disease of the left knee, degenerative disc disease of the cervical and lumbar spines, and thoracic radiculopathy.  (Id.)  However, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed in impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (AR 28.)

After considering the entire record, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b) and § 416.967(b), except lift and/or carry up to 20 lbs occasionally and 10 lbs frequently; sit about 6 hours in an 8-hour workday and stand and/or walk 6 hours in an 8-hour workday; frequently handle, finger, and feel; occasionally push, or pull with the left lower extremity; and occasionally climb, stoop, kneel,

crouch and crawl.  Plaintiff was capable of simple routine tasks and occasional public contact (AR 32.)

The ALJ then found that that Plaintiff was unable to perform any past relevant work, she was 32 years old on the alleged disability onset date, and she had at least a high school education. (AR 39.)  The ALJ discussed that transferability of job skills was not material to the determination of disability because using the Medical-Vocational Rules as a framework supported a finding that the claimant was "not disabled," whether or not Plaintiff had transferable job skills. (Id.)  Considering Plaintiff's age, education, work experience, and RFC, the ALJ found that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. (Id.)  Accordingly, the ALJ concluded that Plaintiff had not been under disability, as defined by the Social Security Act, from January 1, 202, through the date of the ALJ's decision, May 15, 2024.  (AR 40-41.)

Plaintiff sought timely review of the Commissioner's decision in the federal courts.  (ECF No. 1.)  The parties consented to the jurisdiction of the United States Magistrate Judge.  (ECF Nos. 7, 8 , 9.)  Thereafter, the parties filed their briefs on the matter.[1]  (ECF Nos. 13, 15.)

## II.

## LEGAL STANDARD

### A.    The Disability Standard

To qualify for disability insurance benefits under the Social Security Act, a claimant must show she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §

---

[1] On December 1, 2022, the Supplemental Rules for Social Security became effective.  Rule 5 states, "[t]he action is presented for decision by the parties' briefs."  Fed. R. Civ. P. Appx. Rule 5.  The 2022 Advisory Committee noted that "Rule 5 states the procedure for presenting for decision on the merits a [42 U.S.C.] § 405(g) review action that is governed by the Supplemental Rules."  Fed. R. Civ. P. Appx. Rule 5 advisory committee note 2022.  Like an appeal, "the briefs present the action for decision on the merits.  This procedure displaces summary judgment or such devices as a joint statement of facts as the means of review on the administrative record."  Id.  The 2022 Advisory Committee unambiguously clarified that "Rule 5 also displaces local rules or practices that are inconsistent with the simplified procedure established by these Supplemental Rules for treating the action as one for review on the administrative record."  Id.  Here, Plaintiff filed a motion for summary judgment, which the Court will construe as a brief in support of her position on whether the Court should affirm, modify, or reverse the decision of the Commissioner.  42 U.S.C. § 405(g).

423(d)(1)(A).  The Social Security Regulations set out a five-step sequential evaluation process to be used in determining whether a claimant is disabled.  20 C.F.R. § 404.1520;[2]  Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1194 (9th Cir. 2004).  The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

> Step one: Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is not disabled.  If not, proceed to step two.
>
> Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work?  If so, proceed to step three.  If not, the claimant is not disabled.
>
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is disabled.  If not, proceed to step four.
>
> Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work?  If so, the claimant is not disabled.  If not, proceed to step five.
>
> Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy?  If so, the claimant is not disabled.  If not, the claimant is disabled.

Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).  The burden of proof is on the claimant at steps one through four.  Ford v. Saul, 950 F.3d 1141, 1148 (9th Cir. 2020).  A claimant establishes a *prima facie* case of qualifying disability once she has carried the burden of proof from step one through step four.

Before making the step four determination, the ALJ first must determine the claimant's RFC.  20 C.F.R. § 416.920(e).  The RFC is "the most [one] can still do despite [his or her] limitations" and represents an assessment "based on all the relevant evidence."  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  The RFC must consider all the claimant's impairments, including those that are not severe.  20 C.F.R. §§ 416.920(e); 416.945(a)(2); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).[3]  "[I]t is the responsibility of the ALJ, not the

---

[2] The regulations which apply to disability insurance benefits, 20 C.F.R. §§ 404.1501 et seq., and the regulations which apply to SSI benefits, 20 C.F.R. §§ 416.901 et seq., are generally the same for both types of benefits. Accordingly, while Plaintiff seeks only Social Security benefits under Title II in this case, to the extent cases cited herein may reference one or both sets of regulations, the Court notes these cases and regulations are applicable to the instant matter.

[3] SSRs are "final opinions and orders and statements of policy and interpretations" issued by the Commissioner.  20

claimant's physician, to determine residual functional capacity." Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001); 20 C.F.R. §§ 404.1545(a)(1), 404.1546(c).

At step five, the burden shifts to the Commissioner, who must then show that there are a significant number of jobs in the national economy that the claimant can perform given her RFC, age, education, and work experience. 20 C.F.R. § 416.912(g); Lounsburry v. Barnhart, 468 F.3d 1111, 1114 (9th Cir. 2006). To do this, the ALJ can use either the Medical Vocational Guidelines ("grids") or rely upon the testimony of a VE. See 20 C.F.R. § 404 Subpart P, Appendix 2; Lounsburry, 468 F.3d at 1114; Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001). "Throughout the five-step evaluation, the ALJ 'is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities.'" Ford, 950 F.3d at 1149, quoting Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).

**B.    Standard of Review**

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits. 42 U.S.C. § 405(g). In determining whether to affirm, modify, or reverse an ALJ's decision, the Court reviews only those issues raised by the party challenging the decision. See Lewis v. Apfel, 236 F.3d 503, 517 n.13 (9th Cir. 2001). Further, the Court's review of the Commissioner's decision is a limited one; the Court may not disturb the Commissioner's final decision unless it is based on legal error or the findings of fact are not supported by substantial evidence. 42 U.S.C. § 405(g); Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). "[T]he threshold for such evidentiary sufficiency is not high." Biestek v. Berryhill, 587 U.S. 97, 103 (2019). Rather, "[s]ubstantial evidence is more than a mere scintilla, and means only such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Stiffler v. O'Malley, 102 F.4th 1102, 1106 (9th Cir. 2024), quoting Ford, 950 F.3d at 1154. In other words, "[s]ubstantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support

C.F.R. § 402.35(b)(1). While SSRs do not have the force of law, the Court gives the rulings deference "unless they are plainly erroneous or inconsistent with the Act or regulations." Han v. Bowen, 882 F.2d 1453, 1457 (9th Cir. 1989); see also Avenetti v. Barnhart, 456 F.3d 1122, 1124 (9th Cir. 2006).

a conclusion." Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995).

Should the ALJ err, the Court will not reverse where the error was harmless. Stout, 454 F.3d at 1055-56. "An error is harmless only if it is 'inconsequential to the ultimate nondisability determination.'" Leach v. Kijakazi, 70 F.4th 1251, 1255 (9th Cir. 2023), quoting Lambert v. Saul, 980 F.3d 1266, 1278 (9th Cir. 2020). The burden of showing that an error is not harmless "normally falls upon the party attacking the agency's determination." Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012), quoting Shinseki v. Sanders, 556 U.S. 396, 409 (2009).

Finally, "a reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." Hill v. Astrue, 698 F.3d 1153, 1159 (9th Cir. 2012), quoting Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006). Nor may the Court affirm the ALJ on a ground upon which he or she did not rely; rather, the Court may review only the reasons stated by the ALJ in his decision. Orn v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007); see also Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003). It is not this Court's function to second guess the ALJ's conclusions and substitute the Court's judgment for the ALJ's; rather, if the evidence "is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld." Ford, 950 F.3d at 1154, quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).

**III.**

**DISCUSSION AND ANALYSIS**

Plaintiff argues that the ALJ erred in three ways. First, Plaintiff argues that the ALJ failed to resolve an apparent conflict with the DOT arising from hypothetical from the ALJ to the VE regarding work requiring constant use of the hands. (ECF No. 11, pp. 6-8.) Second, Plaintiff argues that the ALJ erred in her analysis of Plaintiff's subjective testimony regarding her symptoms and limitations. (Id. at pp. 9-16.) Third, Plaintiff argues that the ALJ failed to develop the record. (Id. at pp. 16-17.) The Commissioner opposes, arguing that substantial evidence supports the ALJ's analysis of Plaintiff's subjective complaints as well as the ALJ's formulation of the RFC. (ECF No. 15.) The Court agrees with the Commissioner.

**A.      Conflict Between the VE and the DOT**

Plaintiff argues that during the hearing, the ALJ clarified a hypothetical to the VE that Plaintiff could "frequently engage in manipulation," suggesting that, in Plaintiff's view, the ALJ intended to limit Plaintiff to frequent handling, fingering, and feeling *in combination*. (ECF No. 11, p. 8.) Plaintiff asserts that this is significant because jobs identified by the VE in the DOT all require only frequent handling and fingers—*not* in combination.[4] The Court is not persuaded.

As relevant here, "[a]n applicant is entitled to disability benefits unless the ALJ finds that the person is capable of making the adjustment to other work." Gutierrez v. Colvin, 844 F.3d 804, 807 (9th Cir. 2016). The DOT "is not the sole source of admissible information concerning jobs." Johnson v. Shalala, 60 F.3d 1428, 1435 (9th Cir. 1995) (internal quotation omitted). "The Secretary may take administrative notice of any reliable job information, including . . . the services of a vocational expert." Id. (internal quotation omitted); see Biestek v. Berryhill, 587 U.S. 97, 100 (2019), citing 20 C.F.R. §§ 404.1566(e), 416.966(e); SSA, Hearings, Appeals, and Litigation Law Manual I-2-5-50 (Aug. 29, 2014). Though, the DOT still "guides the analysis." Gutierrez, 844 F.3d at 807. If the VE's opinion that the applicant is able to work conflicts with, or seems to conflict with, the requirements listed in the DOT, "then the ALJ must ask the expert to reconcile the conflict before relying on the expert to decide if the claimant is disabled." Id., citing SSR 00-4P, 2000 WL 1898704, at *2 (2000).

The Ninth Circuit has explained that for a difference between an VE's testimony and the DOT's listing "to be fairly characterized as a conflict, it must be obvious or apparent." Id. at 808. "This means that the testimony must be at odds with the [DOT's] listing of job requirements that are essential, integral, or expected." Id. This is so because "tasks that aren't essential, integral, or

---

[4] Plaintiff has included three exhibits from OccuCollect.com, which Plaintiff declares "faithfully replicates the [Selected Characteristics of Occupations] data" from the U.S. Department of Labor, as well as DOT Appendix C definitions. Plaintiff has offered no authority for the Court to accept and review unadmitted and unauthenticated exhibits on review of a social security determination. Were these exact exhibits critical to the record, Plaintiff should have moved to include them when seeking review with the Appeals Council. Accordingly, the Court will not consider the attached exhibits. To be sure, Plaintiff's observation that the Commissioner regularly takes administrative notice of the "SCO" is true, see EM-24026 (S.S.A. May 28, 2026); 20 C.F.R. §§ 404.1560(b)(2), 416.960.(b)(2), and the exhibits may contain partially faithfully produced SCO records; however, Plaintiff has offered the Court printouts from a website of unknown origin that does not purport to replicate the SCO in full. Plaintiff's declaration cannot remedy this. That said, the Court may, where appropriate, take notice of the SCO and the DOT, including Appendix C, notwithstanding its determination to not accept Plaintiff's attached exhibits.

expected parts of a job are less likely to qualify as apparent conflicts that the ALJ must ask about."

Id.

At the hearing, the ALJ asked the VE the following hypothetical questions:

> ALJ: For the following hypothetical questions if you would please assume an individual of the same age, education and work experience of the claimant, hypothetical one the individual could perform light exertional work, only occasional push or pull with the left lower extremity, occasional ramps or stairs, ladders, ropes or scaffolds, occasional stoop, kneel, crouch or crawl, the individual would be capable of simple, routine tasks, only occasional public contact. . . .   Would there be other jobs this individual could perform?

> VE: Yes, Your Honor.   I would cite some examples such as assembler of small products, DOT number 706.687-022, light, SVP 2, with 1,100,00 [jobs] in the U.S., inspector, DOT number 559.687-074, light SVP 2, with 109,000 [jobs] in the U.S., and marker, DOT number 209.587-034, light, SVP 2, with 28,000 [jobs] in the U.S.

> ALJ:  Hypothetical two if I added to the limitation of hypothetical one that the individual could frequently handle, finger, feel, so frequently engage in manipulation, fine manipulation, would that change your answer to hypothetical one?

> VE: I would – the assembler of small products and inspector could be done, marker would have be changed out and I could give you garment sorter, DOT number 222.687-014, light SVP 2, with 26,000 [jobs] in the U.S.

(AR 65-66.)

In context, the Court views the second hypothetical from the ALJ to the VE as adding the limitation that an "individual could frequently handle, finger, feel," followed by commentary that "so frequently engage in manipulation, fine manipulation."  In other words, the Court finds that the ALJ meant, and said, to add a limitation of frequently handling, fingering, and feeling, and not limiting Plaintiff to those in combination.   Plaintiff's lesson on adverbial distribution is not persuasive.  (ECF No. 16, pp. 4-5.)  Indeed, it took the Court several readings to understand how Plaintiff came to an *in combination* reading of the ALJ's hypothetical.  Moreover, had the ALJ intended "frequently handling, fingering, and feeling" to be considered in combination, the Court believes she would have just said so.

In light of the forgoing, the Court is hard pressed to find that any conflict (if there were

8

even one at all) between the DOT and the testimony of the VE was "obvious or apparent." Plaintiff's remaining contentions on this issue are otherwise without merit.

Thus, the ALJ did not err.

**B.    Plaintiff's Subjective Complaints**

Plaintiff argues that the ALJ did not adequately discuss her rejections of Plaintiff's testimony regarding symptoms of fatigue, depressed mood/abnormal affect, suicidal ideation, and physical impairments, including Plaintiff's hands.  (ECF No. 11, pp. 13-16.)  The Commissioner opposes, arguing that the ALJ's opinion was supported by the medical evidence, Plaintiff's treatment history, and Plaintiff's activities of daily living ("ADLs").  (ECF No. 15, pp. 9-18.)  The Court agrees with the Commissioner.

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities."  Garrison v. Colvin, 759 F.3d 995, 1010 (9th Cir. 2014), quoting Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir.1995).  As relevant here, where the ALJ "determines that a claimant . . . is not malingering and has provided objective medical evidence of an underlying impairment which might reasonably produce the pain or other symptoms she alleges, the ALJ may reject the claimant's testimony about the severity of those symptoms only by providing specific, clear, and convincing reasons for doing so."  Lambert, 980 F.3d at 1277, quoting Brown-Hunter v. Colvin, 806 F.3d 487, 488-89 (9th Cir. 2015).  "Ultimately, the 'clear and convincing' standard requires an ALJ to show his work."  Smartt v. Kijakazi, 53 F.4th 489, 499 (9th Cir. 2022).  An ALJ must show their work by "identify[ing] the testimony [from a claimant] she or he finds not to be credible and . . . explain[ing] what evidence undermines that testimony."  Lambert, 980 F.3d at 1277, quoting Treichler v. Comm. of Soc. Sec. Admin., 775 F.3d 1090, 1102 (9th Cir. 2014).  Boilerplate statements and general summaries of the evidence, without more, are not enough.  Id. at 1277-78.  That said, an ALJ is not required "to perform a line-by-line exegesis of the claimant's testimony" or "draft dissertations when denying benefits."  Id. at 1277.

While "an ALJ cannot insist on clear medical evidence to support each part of a claimant's subjective pain testimony when there is no objective testimony evincing otherwise, . . . [w]hen

9

objective medical evidence in the record is *inconsistent* with the claimant's subjective testimony, the ALJ may indeed weigh it as undercutting such testimony." Smartt, 53 F.4th at 498 (emphasis in original).  Indeed, "[c]ontradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony."  Carmickle v. Commissioner, Social Sec. Admin., 533 F.3d 1155, 1161 (9th Cir. 2008).  "The standard isn't whether [a] court is convinced, but instead whether the ALJ's rationale is clear enough that it has the power to convince."  Smartt, 53 F4th at 499.

The ALJ gave a lengthy summary and analysis of Plaintiff's testimony.  (AR 32-39.) Because Plaintiff has limited her argument to her subjective testimony regarding depressed mood/abnormal affect (including suicidal ideation), fatigue/weakness, Plaintiff's hand impairment (including her noncompliance with physical therapy), the Court will limit its analysis to those symptoms.  Thus, the ALJ summarized Plaintiff's relevant testimony below:

> At the hearing held on January 23, 2024, the claimant testified that her mother had been supporting her financially since November 2020, and was also her caregiver, however she lives alone in an apartment.  The claimant said that she was unable to work because she was in constant pain and had gone downhill since November 14, 2020.  She was diagnosed twice with a conversion disorder, with the second diagnosis by a neurologist in Bakersfield, California.  She testified was unable to open her hands or jars, write, or brush her hair.  She had difficulty putting on shoes and wore crocs.  She could not stretch her hands and had chronic back pain.
>
> * * *
>
> The claimant said it was very difficult to function and she always went out accompanied by her mother and returned home right away. She reiterated being in constant pain despite taking medication to treat the pain.  Physically, she could not function in the real world like before because of inability to carry or open anything, e.g., was unable to open a jar.
>
> The claimant said that she had severe depression since the death of two very close family members.  She received weel;u [sic] psychotherapy from a therapist.  In terms of whether the psychotherapy she had received for many years helped, the claimant said that it was helping her a lot from having thoughts of suicide and it helped to be in therapy.  The claimant said that her psychotherapist and her previous psychiatrist were aware that she was diagnosed with conversion disorder and had been addressing that problem in their treatment.

> In terms of the conversion disorder, the claimant said that her doctor said that it was a brain disorder where there was an emotional break causing her mind to shut off certain things/functions, which was why her hands could not open and she could only move her thumb and index finger.
>
> She said that her neurologist said that she needed physical therapy and psychotherapy to treat her condition. She was receiving psychotherapy, had a trial of physical therapy (PT) last year, which stopped because she needed a new referral, and was going to restart in a few days. On whether the PT helped, the claimant said she had not seen any results but felt that it would help her and wanted to give it a try.
>
> * * *
>
> In terms of side effects, she said that the combination of medications caused drowsiness and she was always tired or fatigued and depressed. The only time she did not feel pain was when she was asleep. A psychiatrist prescribed her psychotropic medications, and it was helpful in treating the depression.
>
> * * *
>
> Since she could only open her thumb and index finger, she wore baggy clothes and crocs shoes. She often cut herself with her nails, so her mother got her gloves with which to wash herself. Her boyfriend left her years ago before her condition worsened.

(AR 33-34.)

Though the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, the ALJ concluded that "[Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (AR 34.)

### 1.    Depressed Mood and Abnormal Affect

Starting with depressed mood and abnormal affect, the ALJ began by discussing certain mental status exams of Plaintiff. In April 2021, Plaintiff's affect was "flat blunted and mood congruent. The claimant's thought content had depressive cognitions, rumination, and suicidal ideations. . . . The claimant was positive for suicidal ideation and endorsed multiple plans with means. She was diagnosed with severe episode of recurrent major depressive disorder without psychotic features and generalized anxiety disorder. She was willing to engage in treatment (Ex.

11

11F/15).” (Id.)  The ALJ then observed that in December 2021, Plaintiff “was pleasant and cooperative.  The claimant’s mood was anxious, depressed, hopeless, and worried.  Her affect was congruent to mood.  . . . She reported receiving Steraline from her primary care physician, which was helping, but made her feel poor energy (Ex. 12/F/5, 12-15).” (Id.)  In a June 2022 record from the emergency department, Plaintiff reported “she was not actively suicidal.  She was being managed by mental health professionals, had good follow up and had been compliant with her psychiatrist and medications.  The claimant felt the depression was under control (Ex. 20F/101-102).” (Id.)  In an August 2022 examination, “[t]he claimant had normal mood and affect and was alert and oriented . . . (Exs. 20F/6, 29, 48, 65, 73; 22F/10-11, 15-18; 26F/3).” (AR 35.)

The ALJ’s analysis continued, noting that during a January 2023 examination, “the claimant was negative for any psychiatric symptoms and was cooperative, had appropriate mood and affect, normal judgment and was non-suicidal.  She was living independently at home (Ex. 28F/52-56).” (AR 35.)  Treatment notes from April 2023 noted that Plaintiff was “positive for depression and suicidal ideation without a plan.  Although she testified that the combination of medications caused drowsiness and she was always tired or fatigued and depressed, the claimant usually took medication as directed and had no side effects.  Her speech was slow.  She was cooperative and her affect was appropriate.” (Id.)  Moreover, the ALJ observed that “[t]he claimant was being treated for major depressive disorder, recurrent, generalized anxiety disorder and uncomplicated bereavement with medications and therapy.  There were no side effects from the medications, except for an occasional report of feeling mute or numb (Ex. 31F/63, 75, 87, 115, 123-124).” (Id.)

The Court finds that the ALJ more than adequately identified Plaintiff’s testimony, both in the hearing and throughout the medical record regarding depressed mood and abnormal affect.  The Court also finds that the ALJ gave sufficient clear and convincing reasons for discounting Plaintiff’s testimony as to her depressed mood and abnormal affect.

Though Plaintiff identifies that she experienced a suicide attempt and later continued suicidal ideation in April 2021, the ALJ observed that in June 2022 Plaintiff stated herself that she was not suicidal and reported that her depression was under control.  Four months later, Plaintiff’s

mood was again reported as "normal." And in January 2023, it was reported that Plaintiff had appropriate mood and affect, normal judgment and was non-suicidal. That Plaintiff identifies every single instance of being reported depressed or flat does not change the Court's analysis. An ALJ is not required to give line-by-line exegesis of Plaintiff's testimony, and it is within the province of the ALJ to resolve inconsistencies in the record and Plaintiff's testimony. Thus, the Court finds that the ALJ did not engage in cherry-picking here.

### 2.    Fatigue and Weakness

For fatigue and weakness, the ALJ gave the following summary:

> Although she testified that the combination of medications caused drowsiness and she was always tired or fatigued and depressed, examinations of the claimant noted she was alert and oriented to person, place, time and situation and she denied any fatigue or weakness during the review of her systems in March 2022. She was alert and oriented times 4 with no anxiety or depression during a May 2021 exam. The claimant was alert and oriented to person, place, time, and situation with appropriate mood and affect during March and April 2021 examinations. The claimant denied any fatigue during the review of her systems in June and July 2022, and she was negative for fatigue, weakness, agitation, behavioral problems, nervousness, or anxiety. She was alert and oriented to person, place and time, and her mood and affect were normal. The claimant had normal mood and affect and was alert and oriented during an August 2022 examination (Exs. 20F/6, 29, 48, 65, 73; 22F/10-11, 15-18; 26F/3).

(AR 34-35.) The ALJ then continued, noting that in April 2023, "[a]lthough she testified that the combination of medications caused drowsiness and she was always tired or fatigued and depressed, the claimant usually took medication as directed and had no side effects." (AR 35.) In February 2021, Plaintiff had complained of "fatigue and chest pain of unclear neurological significance. Her neurological exam was unremarkable. She said symptoms started since she had COVID in November 2020. Sameh Labib, M.D., noted the claimant's clinical presentation and MRI findings were not consistent with multiple sclerosis (MS) and suspected it was mostly related to the claimant's concomitant depression and anxiety (Ex. 4F/32-38)." (AR 36.)

Plaintiff takes issue with the fact that the ALJ cited to her being "alert and oriented," but she does not directly argue that alert and oriented are incongruent with fatigue. Rather, Plaintiff seems to rely on citing every instance where she complained of fatigue in the record, insinuating

13

that the ALJ failed to account for the alleged symptoms by failing to do so as well.  Again, the ALJ need not conduct a line-by-line exegesis of Plaintiff's testimony.  The Court finds that the ALJ adequately identified Plaintiff's testimony regarding fatigue and weakness throughout the medical record.  The Court also finds that the ALJ gave clear and convincing reasons for discounting this testimony.  In addition to observing that Plaintiff was at various times "alert and oriented," the ALJ also relied on Plaintiff's own denial of fatigue on several occasions, as well as Plaintiff reporting that she had no side effects from her medications.

Therefore, Plaintiff's argument on this front is without merit.

### 3.      Plaintiff's Hand Impairment and Noncompliance with Physical Therapy

Regarding Plaintiff's hand impairment, the ALJ observed that, "[d]espite testimony that in terms of chores, she could mostly microwave food, the claimant reported during a July 2022 follow up visit with her primary care provider that she had modified her cooking method in order to eat healthier meals and avoiding fried greasy junk." (AR 35.)  In February 2021, Plaintiff complained of "loss of grip strength," as well as "numbness/paresthesia in bilateral upper extremities." (AR 35-36.)  An MRI scan of her brain showed "a single 3mm focus of white matter in the left frontal region possible for demyelinating disease and migraine headache.  The brain was otherwise within normal limits." (Id.)  "Her neurological exam was unremarkable." (AR 36.)  Though Plaintiff complained of numbness/paresthesia in the bilateral upper extremities, a nerve conduction study and electromyogram ("EMG") from April 2021 demonstrated showed normal nerve conduction with no evidence of cervical radiculopathy or myopathy, carpal tunnel syndrome, ulnar neuropathy, or radial sensory neuropathy." (AR 36.)  The ALJ observed that Dr. Labib suspected the claimant had a somatization disorder secondary to underlying anxiety and depression (Ex. 5F/7, 9-10)." (Id.)  Furthermore, a subsequent "EMG of the claimant's bilateral extremities from February 2022 was also normal (Ex. 15F/36-38)." (Id.)

Turning to physical therapy, the ALJ discussed that,

> [d]espite claimant testimony that she had not seen any results from PT, the claimant reported in July 2021 follow up visits with her physical therapist that she had increased strength in her back and was getting better.  The claimant reported during . . . January and February 2022 follow up visits that her back was feeling stronger

14

or better.  She had good potential for continued progress and had made gains in mobility and strength.  It was noted in March 2022 that she had deficits in the range of motion and strength limiting her ability to lift heavy objects and walk for extended periods of time without aggravating symptoms.  The claimant reported that she was 50% overall improved.  Although she testified that the trial of PT stopped because she needed a new referral, the PT treatment notes reported her treatments ended because the claimant had been noncompliant and had been contacted multiple times (Exs. 10F/7, 10-12; 16F/18, 20, 22, 26, 31, 36; 25F/8).

(Id.)  Furthermore,

It was noted in March 2022 that she had deficits in the range of motion and strength limiting her ability to lift heavy objects and walk for extended periods of time without aggravating symptoms.  The claimant reported that she was 50% overall improved.  Although she testified that the trial of PT stopped because she needed a new referral, the PT treatment notes reported her treatments ended because the claimant had been noncompliant and had been contacted multiple times (Exs. 10F/7, 10-12; 16F/18, 20, 22, 26, 31, 36; 25F/8).

During an initial examination for PT in August 2022, the claimant reported that her hands had weakened since her stopping PT.  She was last seen in August 2022 and had responded well to conservative care.  However, the claimant had multiple no shows for her follow up appointments from August to September 2022 (Ex. 17F/71-80, 85-87).

(AR 36.)  During a neurological exam in January 2022, it was noted that, "[t]here was normal tone and bulk throughout with no hand muscle atrophy.  Muscle strength was 5/5 in the bilateral upper and lower extremities.  There was decreased pinprick in an ulnar distribution from the wrists down, but intact proprioception. Reflexes were 2+ bilaterally.  Coordination was intact to finger to nose, fine finger movements, etc."  (AR 37.)  The ALJ then found that, "[o]ther examinations of the claimant showed similar clinical signs (Exs. 15F/11; 20F/66, 73; 32F)."  (Id.)

In March 2022, during a review of her systems, "[Plaintiff] denied any back pain, neck pain, joint pain, muscle pain or bilateral upper and lower extremity pain"—notwithstanding that Plaintiff had testified "to having chronic back pain and had great difficulty bending, and could not sit, stand, or lie down for a long time." (Id.)  Moreover,

Although claimant testified to being unable to open or stretch her hands, she was purposefully grasped the fingers of the attending physician during an ER visit in March 2021 and she was negative for musculoskeletal, and neurologic including numbness or tingling during the review of her systems.  The claimant was

15

> negative for any musculoskeletal symptoms during a January 2023 review of systems and the musculoskeletal exam noted normal range of motion and normal strength. There was no swelling, deformity, or focal neurological deficit. Cranial nerves II through XII were intact and claimant normal sensation, motor, and speech (Exs. 20F/25-29, 65; 28F/52, 56).

(Id.) In June 2022, following an unremarkable "MRI scan of the brain, MRA (magnetic resonance angiograph) of the head, and MRI of the cervical spine along with EMG/NCS and routine rheumatological labs, . . . Dr. McDougall discontinued medication for treatment and recommended physical therapy to help with functionality and pain in the hands, and cognitive behavioral therapy to deal with the suspected functional etiology of claimant's symptoms (Ex. 17F/95-98)." (AR 38.) In November 2023, Plaintiff's "neurological evaluations were unremarkable. She was diagnosed with functional neurological symptom disorder with mixed symptoms, bilateral arm weakness and anxiety and was encouraged to continue with psychiatry for evaluation and treatment." (Id.)[5]

For Plaintiff's hand impartment, Plaintiff seemingly argues that the ALJ cited only the emergency room record from March 2021 that Plaintiff was able to forcefully grip a physician's fingers as well as a lack of musculoskeletal and neurological symptoms "including numbness or tingling" during a March 2021 emergency room visit and January 2023 treatment visit. Not so. The ALJ also relied upon a myriad of records that demonstrated that Plaintiff's hand impairment lacked a straightforward neurological origin, the only diagnosis was functional neurological symptom disorder with mixed symptoms which occurred after ruling other conditions out. The ALJ paired that with the records Plaintiff identified, as well a January 2022 record demonstrating that "[t]here was normal tone and bulk throughout with no hand muscle atrophy. Muscle strength was 5/5 in the bilateral upper and lower extremities." Furthermore, the ALJ cited to Plaintiff's own denial in March 2022 of bilateral upper and lower extremity pain. Additionally, a January 2023 review of systems and the musculoskeletal exam revealed "no . . . deformity." (AR 37.) Though Plaintiff cites other records where Plaintiff complains of issues with her hand (e.g., numbness, control, dexterity), the Court finds that the ALJ nonetheless adequately identified

[5] The ALJ defined in a footnote that "Functional neurologic disorder- a newer and broader term that includes what some people call conversion disorder - features nervous system (neurological) symptoms that can't be explained by a neurological disease or other medical condition." (AR 38 n.2.)

Plaintiff's testimony and gave clear and convincing reasons for rejecting it. Plaintiff's argument appears to be more of a weight of the evidence argument, but the Court's function for this type of claim is to review only for whether the ALJ's "rationale is clear enough that it has the power to convince." Smartt, 53 F4th at 499.[6]

Regarding Plaintiff's noncompliance with physical therapy, Plaintiff argues that "[i]n the presence of mental impairments, the exercise of poor judgment in failing to seek or comply with medical treatment recommendations is not a proper basis for rejecting a claimant's symptom testimony." (ECF No. 11, p. 14.) In support of this, Plaintiff cites to Regennitter v. Commissioner of Soc. Sec. Admin., 166 F.3d 1294, 1299-1300 (9th Cir. 1999); however, the plaintiff in Regennitter was unable to seek treatment because of poverty. Plaintiff does not argue that she failed to comply with her physical therapy because of poverty. To be sure, Regennitter also cites to Nguyen v. Chater, 100 F.3d 1462 (9th Cir. 1996), where an ALJ discounted an examining physician's opinion because the claimant failed to seek mental health treatment until "late in the day." Id. at 1456. Indeed, the Ninth Circuit concluded that the claimant's late treatment could not be used by itself as a "substantial basis on which to conclude that Dr. Brown's assessment of claimant's condition is inaccurate." Id. Thereafter, the Court observed dicta from the Sixth Circuit that "it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." Id., quoting Blankenship v. Bowen, 874 F.2d 1116, 1124 (6th Cir. 1989). However, the issue here is Plaintiff's noncompliance with *physical* therapy, and Plaintiff has not otherwise demonstrated that her mental health impairments explain her noncompliance beyond conclusory assertions.

The Commissioner cites to Burch v. Barnhart, 400 F.3d 676 (9th Cir. 2005), where the Ninth Circuit observed that lack of consistent treatment, even if a claimant sought some treatment, "is powerful evidence regarding the extent to which she was in pain." Id. at 681. Here, Plaintiff alleged that she had not seen any results from physical therapy, but this is contradicted by

---

[6] Though he ALJ found that "[t]he claimant lives alone, and uses her hands in a myriad of ways as is necessary when one lives alone" (AR 39) without necessarily discussing the import of ADLs, the Court finds that the ALJ's reliance on the medical record nonetheless supports her decision regarding Plaintiff's hand impairment. Thus, any error here would be harmless.

17

Plaintiff's follow up reports from July 2021, January and February 2022, and March 2022, where Plaintiff reported improvement. While Plaintiff testified that she stopped physical therapy because she needed a new referral, the ALJ cited to the record where Plaintiff had been noted as noncompliant and that she had been contacted multiple times. (AR 36, citing Ex. 10F/7, 10-12; 16F/18, 20, 22, 26, 31, 36; 25F/8.) The most recent record was in August 2022 where it was noted that Plaintiff responded to conservative care; however, and again, Plaintiff had multiple no shows for her follow up appoints from August to September 2022. (AR 37, citing Ex. 17F/71-80, 85-87). In context, the ALJ's reliance on Plaintiff's noncompliance was appropriate.

In sum, the ALJ did not err in her analysis of Plaintiff's subjective testimony regarding severity of symptoms.

**C.     Duty to Develop the Record**

Plaintiff argues that there is no medical record "translating objective findings of [Plaintiff's] ability to use her hands into functional limitations." (ECF No. 11, p. 16.) Thus, Plaintiff reasons that the ALJ made this determination on her own but should have developed the record by obtaining another functional opinion. This argument is unavailing.

"The claimant has the burden of proving that she is disabled." Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996). However, "[t]he ALJ always has a 'special duty to fully and fairly develop the record and to assure that the claimant's interests are considered . . . even when the claimant is represented by counsel.'" Celaya v. Halter, 332 F.3d 1177, 1183 (9th Cir. 2003), quoting Brown v. Heckler, 713 F.2d 441, 443 (9th Cir. 1983). "[I]t is incumbent upon the ALJ to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts. [The ALJ] must be especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." Id., quoting Higbee v. Sullivan, 975 F.2d 558, 561 (9th Cir. 1992). Further, the ALJ's duty to develop the record fully is heightened where the claimant may be mentally ill and thus unable to protect his own interests. Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001), citing Higbee, 975 F.2d at 562.

The Ninth Circuit has explained that ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to

"conduct an appropriate inquiry." Tonapetyan, 242 F.3d at 1150 (quoting Smolen, 80 F.3d at 1288). "The ALJ may discharge this duty in several ways, including: subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record." Id. (citations omitted). Similarly, the regulations provide the ALJ may order further consultative examination to "resolve an inconsistency in the evidence or when the evidence as a whole is insufficient to support a determination or decision." See 20 C.F.R. § 416.919a. Examples of situations under which further developing the record may be required include when the additional evidence needed is not contained in the records of the claimant's medical sources, and when highly technical or specialized medical evidence not available from the claimant's medical sources is needed. 20 C.F.R. § 416.919a(b). Once the duty to further develop the record is triggered, failure to do so constitutes reversible error. See Tonapetyan, 242 F.3d at 1150-51.

To begin, the Court agrees with the Commissioner that there were two opinions from state agency medical consultants that discussed Plaintiff's ability to use her hands in terms of functional limitations. (AR 38-39.) That said, the ALJ rejected that portion of the opinions regarding handling, finger, and feeling because the ALJ found their lesser restriction was not congruent with Plaintiff's diagnosed functional disorder. (AR 39.) Thus, the ALJ gave Plaintiff a more restrictive limitation by finding she was limited to "frequent handling, fingering, and feeling." (Id.)

Critically, Plaintiff has not adequately articulated how the record is ambiguous or incomplete, nor is it readily apparent to the Court. Rather, it appears the record was quite complete (with the ALJ even allowing for additional evidence to be submitted). And while the ALJ did not rely on that portion of the state agency consultative opinion, the ALJ nonetheless incorporated the findings related to Plaintiff's functional disorder in coming to her determination. (AR 39.)

Relatedly, the Court has previously rejected similar arguments that an ALJ is required to obtain a comprehensive medical exam in every case before rendering an RFC. Scott T. C. v. Commissioner of Social Security, No. 1:23-cv-01776-SAB, 2025 WL 227288 (E.D. Cal. Jan. 17, 2025); see, e.g., 20 C.F.R. § 404.1519a(b). Thus, Plaintiff's general argument that the ALJ was

19

*required* to obtain an additional functional report is without merit under the circumstances of this case. The ALJ adequately discharged her duty to translate and incorporate clinical findings into a succinct RFC. See 20 C.F.R. §§ 404.1545(a)(1), 4041546(c).

Accordingly, the ALJ did not err.

**IV.**

**CONCLUSION AND ORDER**

For the foregoing reasons, IT IS HEREBY ORDERED that the decision of the Commissioner of Social Security is AFFIRMED. It is FURTHER ORDERED that judgment be entered in favor of Defendant Commissioner of Social Security and against Plaintiff Frances Perez. The Clerk of the Court is directed to CLOSE this action.

IT IS SO ORDERED.

Dated: __**February 11, 2026**__                    _____

STANLEY A. BOONE
United States Magistrate Judge

20